IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEAN KILGORE, Executrix of the Estate of VICTOR KILGORE, and widow in her own right, | : : : | Consolidated under MDL Docket No. 875 |
| Plaintiffs, | : : : | C.A. No. 2:13-cv-4029-ER |
| v. | : : | ASBESTOS CASE |
| DAP, INC., et al., | : : : : | Philadelphia County Court of Common Pleas June Term, 2013 |
| Defendants. | : | No. 0881 |

**DEFENDANT, DAP, INC.'S REPLY IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' Opposition proffers no issue of material fact, and summary judgment must be granted. Plaintiffs have yet to provide any evidence of asbestos content in the DAP glazing and caulk used by Mr. Kilgore. Importantly, Plaintiffs concede that DAP never manufactured an asbestos-containing spackle or joint compound.[1] As such, the only two DAP products at issue are window glazing and caulk, and Plaintiffs have produced no evidence establishing asbestos content in either product.[2] [3]

In their very first sentence, Plaintiffs concede that Mr. Kilgore had ***no knowledge of asbestos content*** in any DAP product.[4] This is not disputed. Moreover, neither Mr. Kilgore nor

---

[1] *See* Plaintiffs' Opposition, p. 2.
[2] *See* Plaintiffs' Opposition, p. 1, setting forth that Mr. Kilore identified DAP glazing and Mr. Miller identified DAP caulk; *see also,* DAP's Motion for Summary Judgment.
[3] Notably, in their Opposition, Plaintiffs falsely and illogically assert that Mr. Kilgore and Mr. Miller identified the same DAP product, an "asbestos glazing compound", with allegedly conflicting levels of exposure resulting in an alleged issue of fact for the jury. (*See* Plaintiffs' Opposition, pp. 1-2.) This is absolutely false, as Plaintiffs themselves well know. Mr. Kilgore identified DAP glazing, which he only used 10 times, and Mr. Miller identified a DAP caulk - many of which were always asbestos-free. Plaintiffs themselves confirm these very facts in their Opposition. To claim otherwise, in contradiction to other content within that very same Opposition, is an utterly disingenuous and red-herring effort to create a fantastical issue of fact where none exists.
[4] *See* Plaintiffs' Opposition, p. 1.

Mr. Miller could confirm that the DAP glazing and caulk were used prior to 1979 (the year in which all DAP products were henceforth asbestos-free). Significantly, Mr. Kilgore did not know when he first used DAP glazing[5], and Mr. Miller, *who did not even work with Mr. Kilgore until the 1980s*, admittedly did not know if DAP caulk was used at Aberdeen prior to the 1980s.[6]

Despite the above, in a roundabout and completely illogical attempt to establish asbestos content, Plaintiffs now press a "stockpiling" argument, falsely asserting that the DAP products were stockpiled, and therefore must have existed at Aberdeen prior to 1979, and therefore must have contained asbestos.[7]

This argument is completely unfounded, *as Plaintiffs' Opposition lacks any evidence establishing that DAP glazing and caulk even existed at Aberdeen prior to 1979, let alone their premise of "stockpiling"*. No witness testified to any stockpiling of any DAP product.[8] To the contrary, Mr. Kilgore swore that he simply grabbed a can of DAP glazing from the supply center.[9] He offered no testimony that the glazing was "stock-piled" at all.[10] In fact, he could not establish he used DAP glazing prior to 1979.[11]

Mr. Miller, *who did not even work with Mr. Kilgore until the 1980s*, similarly could not establish that DAP caulk was used at Aberdeen prior to the 1980s, stating he "can't speak for certain".[12]

---

[5] *See* Relevant portions of Plaintiff's discovery testimony attached hereto as Exhibit A, at 265:14-20.
[6] *See* Relevant portions of Mr. Miller's videotaped trial testimony attached hereto as Exhibit B, at 21:13-22:1.
[7] *See* Plaintiffs' Opposition, p. 2.
[8] *See* DAP's Motion for Summary Judgment; *see also,* Plaintiffs' Opposition, lacking any evidence establishing even the existence of DAP glazing and caulk at Aberdeen prior to 1979, let alone their premise of "stockpiling".
[9] Exhibit A, at 285:9-23.
[10] *See* DAP's Motion for Summary Judgment; *see also,* Plaintiffs' Opposition, lacking any testimonial evidence establishing their "stockpiling" assertion.
[11] Exhibit A, 265:14-20.
[12] Exhibit B, 21:13-22:1.

In a second unfounded attempt to establish asbestos content, Plaintiffs assert that <u>only</u> DAP brand glazing and caulk were used at Aberdeen, and therefore those DAP products must have been used at Aberdeen prior to 1979, and therefore must have contained asbestos.[13] Again, the very premise of Plaintiffs' argument is borne out as false. As stated above, neither Plaintiff nor Mr. Miller could establish that DAP glazing and caulk were present and/or used at Aberdeen prior to 1979.[14] In fact, Mr. Kilgore additionally testified that he could have been using a *different* brand of glazing at any given time.[15] *Clearly, there is no basis for Plaintiffs' present-day assertion that only DAP glazing and caulk were used prior to 1979, since both Plaintiff himself and his co-worker frankly and plainly denied any support for this point.*

Plaintiffs also sidestep the critical point that ***many DAP caulks were asbestos-free prior to 1979.***[16] As such, even if Plaintiff had used DAP caulk prior to 1979, there ***still*** is no evidence of asbestos content. Given Plaintiffs' failure to produce even a scintilla of admissible evidence of asbestos content, it remains just as likely that the caulk was an *asbestos-free* composition. Any conclusion in this regard would be an utter gamble, and asking a jury to make that determination would not only be unfair, it would be impermissible guesswork lacking any basis in fact. There is simply no way for Plaintiffs, or anyone, to establish asbestos content in the identified caulk. Summary judgment should be granted.

Finally, as to the glazing, even if Plaintiffs had established that Mr. Kilgore used it prior to 1979 and that it therefore contained asbestos, Plaintiffs concede that Mr. Kilgore *only used it*

---

[13] *See* Plaintiffs' Opposition, p. 1.
[14] *See supra.*
[15] Exhibit A, 285:9-23.
[16] *See* DAP's Motion for Summary Judgment and Exhibit B attached thereto.

*10 times.*[17] Plaintiffs nonetheless argue that "it does not tell us how much exposure he actually had".[18] Critically, however, Plaintiff admitted that these 10 occasions *were actually only 10 windows in total over his lifetime, which he himself defined as "not often".*[19] Plaintiff further testified that he did not sand the glazing and that it was not dusty.[20] Thus, even if he had used the DAP glazing prior to 1979, clearly "we" know exactly how much "exposure" Plaintiff had – ***zero to de minimis, at best.***

This issue was recently addressed by The Honorable Judge Robreno in the Palmer case, where Judge Robreno applied Gregg and determined that the decedent's exposure was *de minimis,* thereby resulting in summary judgment for the defendant. The Court held that even if the defendant were liable for the raw asbestos on the defendant's machines, **plaintiff's evidence was that, over the course of 15 years, the decedent only experienced exposure to the raw asbestos "a handful of times"**.[21] The Court further held:

> **Therefore, applying Pennsylvania law, no reasonable jury could conclude from the evidence that Plaintiff's exposure to this asbestos was a substantial factor in the development of his mesothelioma**.[22]

The facts of the instant matter warrant summary judgment even more so than in Palmer. Mr. Kilgore admittedly only used the DAP glazing 10 times, an amount that he defined as "not often". He confirmed that he never sanded the glazing and it was not dusty. Thus, even if Plaintiffs had established that Mr. Kilgore used the glazing prior to 1979 and that it therefore contained asbestos (which is not established), Mr. Kilgore's use of the glazing was nothing more

---

[17] *See* Plaintiffs' Opposition, p. 1.
[18] *See* Plaintiffs' Opposition, p. 1.
[19] Exhibit A, 275:23-24; 281:25-282:3.
[20] *See* Motion for Summary Judgment, p. 3.
[21] Palmer v. Heidelberg USA, Inc., EDPA, No. 12-05034, USDC (October 10, 2014) [emphasis added].
[22] *Id.* at 6 [emphasis added].

-4-

than *de minimis*. He failed to establish dust inhalation from that glazing on a regular and frequent basis.

By way of further example, in Gregg, the Pennsylvania Court held that plaintiff's usage of Appellant's brakes (3 occasions of usage involving 30 minutes or less of exposure on each occasion) was ***insufficient*** to raise an inference that such exposure was a substantial contributing factor to plaintiff's injury.[23] In finding in favor of defendant, the Gregg Court cited to Lohrmann.[24] In Lohrmann, the plaintiff's exposure to the defendant's product was upwards of 15 occasions, sometimes with dust exposure lasting eight hours on each occasion.[25] That Court nonetheless held that such exposure was insufficient to demonstrated causation.[26]

Here, even assuming *all* facts in favor of plaintiffs, the entire "exposure" to DAP glazing was only 10 occasions – which Mr. Kilgore himself testified was "not often".[27] Plaintiffs do not dispute this. Of these 10 occasions, Mr. Kilgore himself admitted that he did not sand the glazing and it was *not dusty*.[28] No jury can reasonably conclude that 10 occasions of applying a wet product - which was not dusty - was a significant contributory factor to plaintiff's disease in

---

[23] Gregg v. VJ Auto Parts, 596 Pa. 274, 943 A.2d 216 (December 28, 2007), finding in favor of Appellant, V.J. Auto Parts in determining that *de minimis* exposure is insufficient to establish causation in dose-response diseases. In Gregg, the Court held that plaintiff's usage of Appellant's brakes (3 occasions of usage involving 30 minutes or less of exposure on each occasion) was ***insufficient*** to raise an inference that such exposure was a substantial contributing factor to plaintiff's injury. (Id.) Likewise, the Gregg Court made reference to Lohrmann in which that plaintiff's exposure (10 to 15 occasions for a duration of 1 to 8 hours of exposure over 39 years) was also insufficient to raise an inference of causation. Lohrmann v. Pittsburg Corning Corporation, 782 F.2d 1156, 1163 (4th Cir. 1986). The Gregg Court took notice of V.J. Auto Parts's argument that it was unfair of plaintiff to hale a peripheral defendant into court based on a minimal exposure, while ignoring plaintiff's 40 years of alternative exposure to asbestos. Gregg v. VJ Auto Parts, 596 Pa. 274, 943 A.2d 216 (December 28, 2007).

[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *See* Motion for Summary Judgment, p. 3.
[28] *Id.*

the instant case. Where is Plaintiffs' opposition to this point? In accordance with Palmer,

Gregg, Howard, and Lohrmann, summary judgment must be granted.

              Respectfully submitted,

              **WILBRAHAM, LAWLER & BUBA**

              By: */s/* Barbara J. Buba, Esq.
                Barbara J. Buba, Esq.
                Michael J. Block, Esq.
                Attorney for Defendant, DAP, Inc.

Dated: November 5, 2014

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 5th day of November, 2014, a copy of the foregoing **Reply in Support of Motion for Summary Judgment,** was filed electronically this day and is available for viewing from the Court's ECF system.  Notice of this filing will be sent to all counsel of record via the Court's ECF system

      /s/ Barbara J. Buba, Esq.
Barbara Buba, Esq.
I.D. No. 36440
1818 Market Street, Suite 3100
Philadelphia, PA 19103
215-564-4141
bbuba@wlbdeflaw.com

# EXHIBIT A

IN THE COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

| | | |
|---|---|---|
| VICTOR B. KILGORE & | : | JUNE TERM, 2013 |
| JEAN KILGORE, h/w | : | |
|     Plaintiffs | : | |
| | : | |
|     vs. | : | |
| | : | |
| ALLEN-BRADLEY COMPANY, | : | |
| et al | : | |
|     Defendants | : | NO. 0881 |

- - -

Thursday, June 27, 2013

- - -

Continued Videotape Discovery Deposition of VICTOR B. KILGORE, taken at Marriott City Center, 500 Fayetteville Street, Raleigh, North Carolina, commencing at 10:00 a.m., before Janice L. Welsh, Court Reporter and Notary Public; in and for the Commonwealth of Pennsylvania.

\* \* \*

VERITEXT NATIONAL COURT REPORTING COMPANY
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, Pennsylvania 19103

Page 262

VICTOR B. KILGORE
the ships you served on in the Navy?
A. No.
Q. Do you know the maintenance history of any of the pumps on any of the ships for which you served in the Navy?
A. No.
MR. BUSTAMANTE: Thank you, Mr. Kilgore. Those are all the questions I have.
VIDEOTAPE OPERATOR: The time is 10:13 a.m. We're going off the record.
---
(Whereupon a short recess was taken.)
---
VIDEOTAPE OPERATOR: The time is 10:13 a.m. We're back on the record.
---
EXAMINATION
---
BY MR. SKINNER:
Q. Mr. Kilgore, I forgot one or two questions. With respect to the Wrangell, do you know any of the manufacturers of valves on that ship?

Page 263

VICTOR B. KILGORE
A. No.
MR. SKINNER: That's all the questions I have for you. Thank you.
VIDEOTAPE OPERATOR: The time is 10:14 a.m. We're off the record.
---
(Whereupon a short recess was taken.)
---
VIDEOTAPE OPERATOR: The time is 10:17 a.m. We're back on the record.
---
EXAMINATION
---
BY MR. WHITE:
Q. Sir, can you hear me?
A. Yes.
Q. My name is Edward White. I want to ask you a few questions. Now, you remember your testimony yesterday?
A. Yeah.
Q. You remember the first lady who asked you questions, she went through all the specific locations you lived, all your job

Page 264

VICTOR B. KILGORE
sites, and your time in the Navy, correct?
A. Correct.
Q. And she asked you at each location or job site the specific products that you believe you were exposed to asbestos with, correct?
A. Correct.
Q. And you either told her the manufacturer of that product or you stated that you didn't know the manufacturer, correct?
A. Yes.
Q. Then at some point after that questioning you were handed a -- I believe it was listed as Exhibit-1, and that was a caption to the case.
MR. PAUL: Yes.
BY MR. WHITE:
Q. Prior to that you did not identify DAP as a manufacturer of any product that you were alleging exposure to asbestos, correct?
A. Right.
Q. And then you saw the exhibit and you noted the company DAP, that you knew them, correct?

Page 265

VICTOR B. KILGORE
A. Yes.
Q. And you knew them because they made a lot of products, correct?
A. Yes.
Q. But you're not alleging that you were ever exposed to asbestos from any DAP products, correct?
A. That's right.
Q. So, at no point in your life you were ever exposed to asbestos from any DAP product that you know of, correct?
A. I couldn't swear to it.
Q. Do you remember what DAP products you worked around in your lifetime?
A. Well, a small amount of spackle and maybe some glazing.
Q. Sir, when you say sometimes, when did you work with these products?
A. I don't know the dates or the years.
Q. How do you know they were DAP products?
A. I read the label.
Q. What did the label say?
A. It said DAP. Other than that I don't know what.

Page 274

VICTOR B. KILGORE

Q. When the product goes on it's moist, correct?
A. Yes.
Q. How long does that product take to cure?
A. It depends. 24 hours is ideal.
Q. Sir, you also said you would later come in and sand the joint compound, correct?
A. Yes. Correct.
Q. When you sanded it you were given a mask to wear, correct?
A. No.
Q. What did you use to sand the joint compound with?
A. Sandpaper.
Q. Do you know what grit sandpaper you used?
A. No.
Q. But it would have been a finer sandpaper, correct?
A. Yes.
Q. Sir, you have no reason to believe that the DAP product contained asbestos, correct?
A. I don't know.
Q. Sir, you also testified that you worked

Page 275

VICTOR B. KILGORE

with a DAP glazing, correct?
A. Yes.
Q. What kind of container did that DAP glazing come in?
A. It was about a quart size.
Q. Quart size can. Do you remember the label of the can?
A. No.
Q. What was the actual name of the product?
A. I'm not sure.
Q. Sir, could you be confusing the name of the products because you just know DAP from other products it makes?
A. Possibly.
Q. So, you're not sure if you actually did work with DAP glazing, correct?
A. Yeah. I'm sure I did work with it.
Q. The DAP glazing, what did you apply the DAP glazing to?
A. Well, if you had to replace window glass it had to have new glazing put on it.
Q. How often did you use the DAP glazing?
A. Not often.
Q. Not often. So, you might have replaced

Page 276

VICTOR B. KILGORE

a window a couple of times?
A. Well, more than a couple of times in 26 years.
Q. Can you estimate how many times you used the DAP glazing? Could you give me a number?
A. Ten.
Q. Around ten, correct?
A. Correct.
Q. This was all to install windows, correct?
A. Yes.
Q. So, this was an outdoor procedure, correct?
A. Yes.
Q. Now, the glazing, that's kind of the final step in window installation, correct?
A. Yes.
Q. So, you have basically a finished product, which is a window, and you're applying that to a structure, correct?
A. Correct.
Q. The glazing is used as a sealer, correct?
A. Correct.

Page 277

VICTOR B. KILGORE

Q. So, a sealer by nature has to be pliable, correct?
A. Correct.
Q. With heat and cold, objects can expand and contract, correct?
A. Yes.
Q. The glaze, which acts as a sealer, has to be able to expand and contract with the material, the sealant, correct?
A. Yeah. Mostly there's a hard glaze on the outside, but the inside stays relatively soft for a long time.
Q. So, this is a tar like material, correct?
A. Well, it's white. I always think of tar being black.
Q. But the consistency of the white glazing is tar like, correct?
A. No. It would be thicker than that.
Q. Thicker than tar but still liquid, correct?
A. It's still pliable.
Q. So, when you put the finished window into the structure you apply the glazing?

Page 278

VICTOR B. KILGORE
1  
2   A. Yes.
3   Q. Did you use a tool to smooth out the
4   glazing?
5   A. Yes.
6   Q. What kind of tool was that?
7   A. We call it a putty knife because
8   originally most glazing was putty.
9   Q. So, after you smoothed out the glazing
10  that was pretty much it, correct?
11  A. That's right.
12  Q. So, you wouldn't sand the finished
13  product, correct?
14  A. No.
15  Q. Now, to put the glazing on the window,
16  that's not a long process, is it?
17  A. No.
18  Q. Does that take about a minute to glaze a
19  window?
20  A. It depends on how much experience you
21  had. It would take me longer.
22  Q. How big was a window that you were
23  putting the glazing on?
24  A. Well, like ten by 12 inch or something
25  like that.

Page 279

VICTOR B. KILGORE
1  
2   Q. A ten to 12 inch window?
3   A. Yeah. The glass in the window frame.
4   You know, there might be a dozen glass in one
5   frame.
6   Q. So, you did approximately ten windows.
7   Did they all have these multiple panes of
8   glass inside?
9   A. Yes.
10  Q. And you also said it took you a little
11  longer than a minute to do this. Do you know
12  how long it would take you to glaze a window?
13  The entire window.
14  A. Like I say, only doing one pane because
15  we're rust replacing broken stuff. It would
16  take two or three minutes to glaze an eight by
17  12.
18  Q. So, two or three minutes to do an eight
19  by 12. Would that be the pane or the entire
20  window?
21  A. That's just the pane.
22  Q. When doing an entire window, how much of
23  a can of glazing would you use?
24  A. About as big as a lemon maybe or a
25  little larger.

Page 280

VICTOR B. KILGORE
1  
2   Q. So, about the size of a lemon per
3   window?
4   A. Yes.
5   Q. Sir, is this the same process, when you
6   were done with a putty knife you scrape the
7   rest in the can and wash it off with soap and
8   water?
9   A. No. Soap and water wasn't any good on
10  it.
11  Q. You would just leave it on the putty
12  knife or throw the putty knife away?
13  A. No. You could let it dry and then
14  scrape it off.
15  Q. Wouldn't it make more sense to use
16  mineral spirits?
17  A. Well, we didn't always have mineral
18  spirits, and it wasn't necessary.
19  Q. But you did have mineral spirits,
20  correct?
21  A. It was available.
22  Q. And you used it sometimes, correct?
23  A. Very seldom.
24  Q. For at least part of the ten windows you
25  did, you cleaned the putty knife with mineral

Page 281

VICTOR B. KILGORE
1  
2   spirits, correct?
3   A. No. I never used it.
4   Q. I thought you said you did use mineral
5   spirits sometimes?
6   A. Not in that particular place.
7   Q. Sir, you have no reason to believe that
8   you were exposed to asbestos from using the
9   DAP glazing, correct?
10  A. That's right.
11  Q. Otherwise, you would have said it as a
12  product you were exposed to during the first
13  woman's examination yesterday, correct?
14  A. Yes.
15  Q. Because it's not a dusty product?
16  A. No.
17  Q. So, sir, you have no reason to believe
18  you were ever exposed to asbestos from any DAP
19  product, correct?
20  A. No. I didn't know what DAP was made out
21  of.
22  Q. And those were the only two DAP products
23  that you used, correct?
24  A. That's right.
25  Q. You used glazing on about ten windows,

Page 282

VICTOR B. KILGORE
1
2  correct?
3  A. Right.
4  Q. And you used joint compound on two
5  rooms, correct?
6  A. Right.
7  Q. When you applied the DAP glazing to the
8  windows, that was outdoor work?
9  A. Yes.
10 Q. Do you remember would you do that in
11 just about any kind of weather?
12 A. Well, you couldn't be out in the rain,
13 and severe cold would be no good.
14 Q. But you would be out applying the
15 glazing and it could be windy?
16 A. It could be.
17 Q. Did anyone else help you glaze those
18 windows?
19 A. Yes. There was mostly two people.
20 Q. The one window would be glazed by two
21 people, correct?
22 A. Well, there might be more than one
23 window.
24 Q. But as you went through -- if you did
25 ten windows, there would be two people glazing

Page 283

VICTOR B. KILGORE
1
2  each window, correct?
3  A. I can't say.
4  Q. Did multiple people work on the windows
5  some of the times?
6  A. Some of the times.
7  Q. Sir, you said you cleaned the putty
8  knife, correct?
9  A. Correct.
10 Q. You said some of the times you scraped
11 off the putty knife?
12 A. Yes.
13 Q. You did that by putting it on the
14 ground, correct?
15 A. Well, different ways.
16 Q. Scrape it on the asphalt?
17 A. Yeah. You might. Or you might have a
18 clean putty knife that you could scrape the
19 other one with.
20 Q. You were doing that at arm's length away
21 from you, correct?
22 A. Yes.
23 Q. There would be no reason for you to hold
24 it over your head and scrape it off, correct?
25 A. That's right.

Page 284

VICTOR B. KILGORE
1
2  Q. That wouldn't make sense, correct?
3  A. That's right.
4  Q. Now, the DAP glazing, you said that was
5  a white product, correct?
6  A. Kind of off white.
7  Q. Was it off white when you opened the
8  container?
9  A. Yeah. You might have to mix it up a
10 little bit.
11 Q. When the product dried was it the same
12 color?
13 A. Yes.
14 Q. And this can that it came in, you said
15 it was a quart can?
16 A. Yes.
17 Q. Quart size?
18 A. That was one size.
19 Q. But that was the size you used on these
20 windows, correct?
21 A. Yeah. Because we didn't do that much.
22 Q. Do you remember how you opened the can?
23 A. Just the way you would open a paint can.
24 Q. With a screwdriver?
25 A. Yes.

Page 285

VICTOR B. KILGORE
1
2  Q. You said you had to stir the mixture
3  inside?
4  A. You may have to. It depends on how long
5  it was on the shelf.
6  Q. What did you use to stir that with, the
7  screwdriver?
8  A. You may.
9  Q. You said you would get this glazing off
10 the shelf. What did you mean by that?
11 A. I mean how long has it sat around before
12 you opened it.
13 Q. Were you picking up this product from a
14 procurement center or just a warehouse or
15 wherever you kept your supplies?
16 A. Just from wherever we kept the supplies.
17 Q. So, you would go to wherever you kept
18 your supplies and just grab whatever glazing
19 was there?
20 A. Yes.
21 Q. So, that could have been DAP glazing or
22 it could have been another glazing sometimes?
23 A. Could have been.
24 Q. Sir, I want to take you back briefly to
25 yesterday. You had testified that about two

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| JEAN KILGORE, Executrix of the Estate of VICTOR B. KILGORE, Deceased, and widow in her own right, | : NO.: 13-CV-4029 <br> : <br> : <br> : <br> : |
| Plaintiff, | : |
| v. | : <br> : |
| ALLEN-BRADLEY COMPANY, et al., | : <br> : <br> : |
| Defendants. | : |

- - -

February 21, 2014

- - -

Videotaped deposition of JAMES MILLER, taken pursuant to notice, was held at the Homewood Suites, Chesapeake Room, 4170 Philadelphia Road, Bel Air, Maryland 21015, commencing at 12:49 p.m., on the above date, before Rhonda Watson, Professional Court Reporter and Notary Public in and for the State of Maryland.

- - -

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com



```
 1  BY MR. PRESENT:
 2      Q.    Okay.  And when you would sand
 3  this material, what would happen to the
 4  atmosphere?
 5            DEFENSE COUNSEL:  Objection;
 6       leading.
 7            THE WITNESS:  There would be dust
 8       in the air.
 9  BY MR. PRESENT:
10      Q.    And when there was dust in the
11  air, would that be -- how close would Mr. Kilgore
12  be to that dust?
13            DEFENSE COUNSEL:  Objection.
14            THE WITNESS:  Well, if it was
15       working on a ceiling, then it would be
16       falling right down in your face.
17  BY MR. PRESENT:
18      Q.    Okay.  And how about if you were
19  working on seams; would -- would it -- would
20  there also be dust that would be in the air from
21  that when you would sand it?
22            DEFENSE COUNSEL:  Objection.
23            THE WITNESS:  Usually it fell
24       straight down, so not too much.
```

```
 1  BY MR. PRESENT:
 2      Q.    Okay.  Would you have to clean up
 3  that dust after the job was over?
 4      A.    Yes.
 5      Q.    Would Mr. Kilgore join you in that
 6  endeavor?
 7      A.    Yes.
 8      Q.    And I believe you testified that
 9  that would happen approximately every two weeks
10  you'd be using it.
11            DEFENSE COUNSEL:  Objection.
12            THE WITNESS:  Approximately, yes.
13  BY MR. PRESENT:
14      Q.    And with respect to the
15  Georgia-Pacific Ready-Mix, do you have any idea
16  how long it had been stored at Aberdeen?
17      A.    No.
18      Q.    Do you have any idea when it had
19  been manufactured?  Like, how long before you
20  would use it --
21      A.    No.
22      Q.    -- it had been manufactured?
23            With respect to this Ready-Mix
24  product, did you see any kind of warning on the
```

```
 1  product telling you that it was hazardous to your
 2  health?
 3      A.    No.
 4            DEFENSE COUNSEL:  Objection;
 5       leading, foundation.
 6  BY MR. PRESENT:
 7      Q.    And would this dust that you
 8  talked about that was generated from the sanding
 9  occur each and every time you and Mr. Kilgore
10  were working with it?
11      A.    Yes.
12            DEFENSE COUNSEL:  Objection.
13  BY MR. PRESENT:
14      Q.    You also mentioned the DAP caulk.
15            Do you know of any other caulks
16  that were used at the Aberdeen facility other
17  than DAP?
18      A.    I can't recall any.
19      Q.    Okay.  And with respect to the DAP
20  caulk, as you testified earlier, this was a moist
21  product going on; is that correct?
22      A.    Yes.
23      Q.    Were there times when you and
24  Mr. Kilgore would have to come back either in
```

```
 1  bathrooms or around windows or other places and
 2  remove this caulk?
 3            DEFENSE COUNSEL:  Objection.
 4            THE WITNESS:  Yes.
 5  BY MR. PRESENT:
 6      Q.    Had its consistency changed at
 7  that particular juncture?
 8            DEFENSE COUNSEL:  Objection.
 9            THE WITNESS:  Yes.
10  BY MR. PRESENT:
11      Q.    In what way had it changed?
12      A.    It was hard and brittle.
13      Q.    ==Okay.  And when you would remove
14  that old caulk, based on your knowledge of the
15  types of caulks that were used at Aberdeen, do
16  you feel certain that it was DAP caulk that you
17  were also taking off?==
18            ==DEFENSE COUNSEL:  Objection;
19       leading.==
20            ==THE WITNESS:  Possible -- good
21       possibility.==
22            ==DEFENSE COUNSEL:  Misstates prior
23       testimony.==
24            ==THE WITNESS:  I can't speak for==
```

1 certain.
2 BY MR. PRESENT:
3     Q.   Okay. Were there times when you
4 went back to the same place where you had applied
5 the DAP caulk and removed it sometime later?
6         DEFENSE COUNSEL: Objection.
7         THE WITNESS: Yes.
8 BY MR. PRESENT:
9     Q.   Okay. And when you would do that
10 and it had dried, would it have any impact or
11 have any effect on the atmosphere or the air?
12         DEFENSE COUNSEL: Object to form.
13         THE WITNESS: There would be
14   particles.
15 BY MR. PRESENT:
16     Q.   Okay. And would that happen each
17 and every time you removed DAP --
18     A.   Most times.
19         DEFENSE COUNSEL: Objection.
20 BY MR. PRESENT:
21     Q.   -- caulk that you would apply?
22     A.   Most times.
23     Q.   And where was Mr. Kilgore in
24 relation to these particles that were in the

1 atmosphere?
2         DEFENSE COUNSEL: Object to form.
3         THE WITNESS: Next to them.
4 BY MR. PRESENT:
5     Q.   Okay. And with respect to this
6 DAP caulk, is that a product that you believe,
7 sitting here today, contained asbestos?
8         DEFENSE COUNSEL: Objection; calls
9   for speculation.
10        THE WITNESS: Yes.
11 BY MR. PRESENT:
12     Q.   And how about with respect to the
13 Ready-Mix product that you spoke of a little
14 earlier; is that a product that as you sit here
15 today, you're convinced had asbestos?
16     A.   Yes.
17     Q.   With respect to the DAP caulk, did
18 you ever see any kind of warning on that product
19 telling you that either you or Mr. Kilgore or
20 anyone that used it could get sick if they --
21     A.   No.
22         DEFENSE COUNSEL: Objection;
23   leaded.
24 BY MR. PRESENT:

1     Q.   -- breathed in any dust or
2 particles?
3     A.   No.
4     Q.   You also talked about Armstrong
5 tile.
6         Do you feel certain, sitting here
7 today, that there were times when you would
8 remove old Armstrong tile from places where it
9 had been put in the Aberdeen facility?
10        DEFENSE COUNSEL: Object to form.
11 BY MR. PRESENT:
12     Q.   Where you had taken up old tile
13 that were Armstrong?
14        DEFENSE COUNSEL: Object to form;
15   calls for speculation.
16        THE WITNESS: Yes.
17 BY MR. PRESENT:
18     Q.   And with respect to that tile,
19 when you would take up the old Armstrong tile,
20 were you with Mr. Kilgore?
21     A.   Yes.
22     Q.   How frequently would that happen?
23     A.   Once a week, once every two weeks.
24     Q.   And when you would do that, would

1 that have any effect on the atmosphere?
2     A.   Yes.
3     Q.   And what would you see in the
4 atmosphere?
5     A.   Dust.
6     Q.   And when the dust was in the air,
7 where was Mr. Kilgore in relation to that dust?
8     A.   We were in it.
9         DEFENSE COUNSEL: Object to form.
10 BY MR. PRESENT:
11     Q.   Okay. Did you ever see any kind
12 of warning on any of the Armstrong tile packages
13 telling you that breathing in that dust could be
14 hazardous to your health?
15        DEFENSE COUNSEL: Objection.
16        THE WITNESS: No, I don't remember.
17 BY MR. PRESENT:
18     Q.   And as you sit here today, are you
19 convinced that that Armstrong tile contained
20 asbestos?
21        DEFENSE COUNSEL: Object to form.
22 BY MR. PRESENT:
23     Q.   As you sit here right now, are you
24 convinced --