**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEAN KILGORE** | : | |
| EXECUTRIX OF THE ESTATE OF | : | |
| VICTOR KILGORE AND JEAN KILGORE, | : | |
| WIDOW IN HER OWN RIGHT, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO.: 2:13-cv-04029-ER |
| **CROWN CORK & SEAL COMPANY,** | : | |
| **INC.** | : | |
| | : | |
| Defendants | : | |
| | : | |
| | : | |
| | : | |

**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**OF CROWN CORK & SEAL COMPANY, INC.**

Defendant, Crown Cork & Seal Company, Inc. ("Crown"), by its attorneys, files this

Reply in Support of its Motion for Summary Judgment.

## INTRODUCTION

Crown is entitled to summary judgment for two reasons, neither of which is refuted by

Planitiff's Answer to Crown's Motion: (1) Plaintiff has no evidence demonstrating even a

material fact as to whether he was exposed to a Crown product; and, (2) even if he was exposed

to a Crown product, Crown is entitled to summary judgment under 15 Pa.C.S.A. § 1929.1 (the

"Statute").

1

Plaintiff initiated the instant suit on June 6, 2013, in the Court of Common Pleas of Philadelphia County. Crown was served with the Complaint on June 14, 2013.[1]

In his original Complaint, plaintiff alleged that he was exposed to asbestos containing products when he worked at the following locations: U.S. Naval ships USS Navarro and USS Wrangell from June 1, 1951 to June 1, 1955; Charles Boyd from June 15, 1955 to December 31, 155; Caterpillar from January 1, 1956 to December 31, 1957; Lower Chanceford Township from January 1, 1958 to May 31, 1958; Emory McGurk from June 1, 1958 to May 31, 1962; and Aberdeen Proving Ground from June 1, 1962 to January 1, 1988. Compl. ¶ 6.

Plaintiff's deposition was recorded on June 26, 27 and 28, 2013. On July 10, 2013, Crane Company removed the case to Federal Court. Plaintiff died on September 15, 2013 and his executrix was substituted as plaintiff. On March 5, 2014, plaintiff filed her Amended Complaint adding PP&L Corporation, and alleging that the decedent was exposed to asbestos while working at a PP&L plant in Holtwood, Pennsylvania.

On September 19, 2014, Crown filed a Motion for Summary Judgment. Although the Motion erroneously included certain arguments not applicable to this case (which Crown withdraws), the Motion argued that plaintiff had produced no evidence that the decedent had actual, frequent, proximate, and regular exposure to any Crown products.

Plaintiff filed her Answer to Crown's summary judgment motion on October 23, 2014. In her response, plaintiff argued both that the decedent had been exposed Crown products, and that the Statute was unconstitutional.

Plaintiff referred to portions of the decedent's deposition testimony as support for her proposition that plaintiff's decedent was exposed to a Crown product, but Mr. Kilgore's

---

[1] Plaintiff sued Crown as successor in interest to Mundet Cork Corporation and alleges that Crown is liable for injuries caused by exposure to the products of Mundet. For purposes of this reply, Crown Cork & Seal Company and Mundet Cork Corporation will be referred to collectively as "Crown."

testimony demonstrates that Crown cannot be liable. Mr. Kilgore testified that he worked at the Holtwood power station in the summer of 1950, for approximately three months. <u>Kilgore Depo. Tr. Vol. I</u>, p. 66. During this time period he did little things such as painting, and general laborer type work. <u>Id.</u>, p. 81. However, Mr. Kilgore did not believe that he was exposed to any asbestos. <u>Id.</u> p. 85. Although he stated that he observed insulation covering the pipes in this area, he was never around anyone who disturbed the insulation, nor did he personally disturb the insulation around the steam pipes. <u>Id.</u>, p. 85. Mr. Kilgore testified that he also worked at the Holtwood station for four months in 1956. <u>Id.</u>, p. 146. He could not recall what he did, other than some spray painting around the boilers just before he was laid off. <u>Id.</u>, pp. 54, 146. Mr. Kilgore thought he might have been exposed to a minor amount of asbestos when he was painting in the boiler room, because he was in proximity to the pipe insulation. <u>Id.</u>, p. 146. However, he never cut or disturbed the insulation, nor was he ever around anyone who cut or disturbed the insulation. <u>Id.</u>

Mr. Kilgore never identified a Crown product as being present during his work at the Holtwood station. Crown had no notice that plaintiff intended to allege exposure to asbestos at the Holtwood station until plaintiff filed her amended complaint, more than eight months after the decedent's deposition was recorded.

In an attempt to overcome the utter lack of identification of any Crown products by the decedent, plaintiff also referred to the testimony of William C. Lowe, whose deposition was recorded in Maryland as a Master Trade Deposition, in 1987.[2] Crown was not involved in asbestos litigation in Maryland in 1987, and was never notified of Mr. Lowe's deposition.

---

[2] In Maryland, plaintiffs' firms are permitted to file personal injury "Master Complaints." A "Master Complaint," and all discovery taken pursuant to that "Master Complaint," applies to all cases, present and future, within a given master trade category. Mr. Lowe's deposition was noticed generally as a "Master Trade Deposition," applicable to all asbestos cases in Baltimore, Maryland. Notice of the deposition was served on all defendants then-named as defendants in asbestos cases in Baltimore, Maryland.

Accordingly, Crown was not at the deposition and did not have the opportunity to cross-examine Mr. Lowe. Mr. Lowe testified that he worked for Mundet Cork Company insulating pipes, boilers, turbines, and other equipment at the Holtwood station in 1954. <u>Lowe Depo. Tr.</u>, pp. 224-225. He testified that he used pipe covering manufactured by various entities including Johns-Manville, Mundet, and Carey.

Because plaintiff raised the constitutionality of the Statute in her answer, Crown here briefs its constitutionality. Under the Statute, Crown is entitled to summary judgment.

<u>**ARGUMENT**</u>

## I.      Plaintiff Has Produced No Admissible Evidence Establishing Exposure To A Crown Product

It is axiomatic that only relevant and admissible evidence may defeat a motion for summary judgment. <u>See</u> <u>Smith v. Allentown</u>, 589 F.3d 684, 693 (3d Cir. 2009); <u>see also</u>, Fed. R. Civ. P. 56(c)(4) (providing that testimony offered in opposition to summary judgment "shall be on personal knowledge, shall set forth such facts as would be admissible in evidence."). Under the Federal Rules of Evidence, prior testimony is hearsay but can be admissible as an exception to the hearsay rule if: (1) the declarant is unavailable; (2) the testimony was taken at a hearing, deposition, or civil action or proceeding; <u>and</u>, (3) the party against whom the testimony is now offered must have had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. <u>See</u>, Fed. R. Evid. 804(b)(1).

The similar motive requirement "assures that the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do at trial if the witness were available to be examined by that party." <u>Kirk v. Raymark Indus. Inc.</u>, 61 F.3d 147, 166 (3d Cir. 1995), <u>quoting</u>, <u>United States v. Salerno</u>, 937 F.2d 797, 806 (2d Cir. 1991). Similarly, Rule 32(a)(1)(A) of the Federal Rules of Civil Procedure provides that deposition

4

testimony may be used against a party only if the party was present or represented at the deposition, or had reasonable notice of it.

Plaintiff's decedent never identified a Crown product as having been present at any of his work sites. The only evidence that plaintiff has offered in support of her allegation that Victor Kilgore was exposed to a Crown product is the testimony of William Lowe. Mr. Lowe's testimony is inadmissible hearsay. Crown was not a named defendant in the action for which Mr. Lowe's deposition was recorded, nor was Crown ever notified that Mr. Lowe was being deposed in that matter. Thus, Crown was deprived of the opportunity to be present and cross-examine Mr. Lowe. Additionally, no other defendant present at that deposition had an incentive to protect the same interests as Crown such that Crown would have been "constructively represented" by the parties in attendance. See Beaumont v. ETL Services, Inc., 761 A.2d 166, 174 (Pa. Super. 2000) (discussing exception to hearsay if parties with similar interests were present during prior testimony and able to protect the interests of the party against whom the plaintiff intends to introduce the testimony).

Even if this testimony were admissible (which it is not), it does not establish that Victor Kilgore was exposed to any Crown products at the Holtwood station. Mr. Lowe's testimony establishes only that in 1954, he used insulation manufactured by Mundet on the pipes, boilers, and other equipment at the Holtwood station. Mr. Lowe did not identify Mr. Kilgore as a co-worker who performed this same work, or who was present while Mr. Lowe was insulating the equipment. In fact, Mr. Kilgore was not present when this work was being performed. Mr. Kilgore worked at the Holtwood station for only a short period of time: three months in 1950 and four months in 1956. Kilgore Depo. Tr. Vol. I, p. 66, 146. While he was at the Holtwood station he never saw any contractors, nor did he see any uniforms or trucks with the name

Mundet. <u>Kilgore Depo. Tr. Vol. II</u>, p. 313.   The insulating work had been completed a few years prior to when Mr. Kilgore worked at the station in 1956.[3] <u>Kilgore Depo Tr. Vol. I</u>, p. 55.  Mr. Kilgore did not recall what type of work he performed at the Holtwood station, other than the "one time" he spray painted around the boiler, <u>Id.</u>, pp. 55, 146, but he later said he never worked in the vicinity of any boilers. <u>Kilgore Depo. Tr. Vol. II</u>, p. 313.   According to plaintiff, because Mr. Lowe supposedly used Mundet insulation on the boilers and other equipment on the power station, then that means Mr. Kilgore was exposed to Mundet insulation by virtue of being in the same facility, some time later.   However, there is no evidence that Mr. Kilgore was anywhere near the same equipment that Mr. Lowe claimed to have insulated

Under the standard set forth in <u>Eckenrod v. GAF</u>, 544 A.2d 50, 53 (Pa. Super. 1988), plaintiff must establish more than the presence of asbestos in the decedent's workplace; plaintiff must prove that the decedent worked in the vicinity where the asbestos containing products were used and that he inhaled asbestos fibers from the defendant's products. <u>See id.</u>, at 53; <u>see also</u>, <u>Burger v. Owens-Illinois</u>, 966 A.2d 611, 615-16 (Pa. Super. 2009).  He must prove regular, frequent, and proximate exposure to asbestos. <u>Eckenrod</u>, 544 A.2d at 53.  Just because an asbestos containing product came into a facility does not establish that the decedent ever inhaled asbestos fibers from that product.  <u>Eckenrod</u>, 544 A.2d at 53; <u>Samarin v. GAF Corp.</u>, 571 A.2d 398, 405 (Pa. Super. 1989).

Although Mr. Kilgore believed he worked in the vicinity of where asbestos containing insulation had once been used, he did not testify to having been in that area or to being near the insulation with any regularity or frequency; he said that he thought he might have been painting

[3] Mr. Kilgore also worked at the Holtwood station in 1950. Mr. Kilgore testified only that he observed insulation covering the steam pipes in various areas of the plant, but was never around anyone who disturbed the insulation, nor did he personally disturb it. In any case, plaintiff has offered no evidence that any Mundet insulation was used at the Holtwood station at that time.

in the boiler room "one time." <u>Kilgore Depo. Tr. Vol I</u>, p. 146. Plaintiff has also offered no

evidence that Mr. Kilgore ever inhaled any fibers from the insulation. When he was working at

Holtwood, he personally did not cut or otherwise disturb the insulation, nor did anyone else cut

or disturb the insulation around him. <u>Id.</u>, p. 147. Additionally, plaintiff offered no evidence

showing that the asbestos Mr. Kilgore believed he might have been exposed to came from a

Crown product, rather than a product of one of many other manufacturers.

Mr. Kilgore's belief that he may have been exposed to a minor amount of asbestos

simply because he worked in proximity to an area where insulation containing asbestos had

previously been used is not sufficient to meet the standard set forth in <u>Eckenrod</u>, <u>supra.; see</u>

<u>Krauss v. Trane U.S. Inc.</u>, 2014 Pa. Super. 241, at *29 (2014) (holding that testimony that

decedent worked twenty to thirty feet from turbines containing asbestos for a very short period of

time, never really got up close to the turbines, and the atmosphere around the turbines was

normal was not sufficient to establish regular and frequent exposure to asbestos); <u>see also</u>, <u>Gregg</u>

<u>v. V-J Auto Parts Co.</u>, 943 A.2d 216, 219 (Pa. 2009)(holding that *de minimus* exposure to a

defendant's product, particularly in absence of evidence excluding other possible sources is not

sufficient to defeat summary judgment). Because plaintiff has failed to produce any evidence

showing regular, frequent to a Crown product, Crown is entitled to summary judgment in its

favor.

**II.**     <u>**Section 1929.1 Is Constitutional, And Entitles Crown To Summary Judgment**</u>

Crown is also entitled to summary judgment under the Statute.

The facts that entitle Crown to summary judgment under § 1929.1 are simple, straight-

forward, and have been put forth by Crown countless times, in the evidentiary package attached

as Exhibit "A":

1)      Crown acquired the asserted asbestos-related liability solely as a successor by merger to Mundet;

2)      The inflation-adjusted value of the assets of Mundet at the time of the merger, at its highest, is approximately $56.9 million; and,

3)      Crown already has paid or has committed to pay more than $475 million for asbestos-related claims.[4]

Over many years of litigation, no plaintiff ever has disputed these facts, or that Crown is entitled to summary judgment under § 1929.1.  As the Pennsylvania Superior Court wrote in 2009:

>   The effect of the Statute of Crown is undisputed.  Crown is a bottle-cap and can manufacturer based in Pennsylvania.  In November 1963, Crown purchased Mundet Cork Corporation.  Mundet Cork operated a division that manufactured asbestos products.  Crown never operated this division. Within 90 days of acquiring Mundet Cork, Crown sold the asbestos-related division.
>   Despite this fleeting involvement with asbestos, in the ensuing years Crown has paid hundreds of millions of dollars in asbestos-related claims. The value of those claims far exceeds the fair market value of Mundet Cork itself.
>   Under the plain language of the Statute, Crown is no liable for Appellants' claims because Crown has already paid out asbestos liabilities exceeding the fair market value of Mundet Cork.

Johnson, et al. v. American Standard, et al., 966 A.2d 573, 576 (Pa. Super. 2009), reversed on other grounds, 8 A.3d 318 (Pa. 2010).[5]  Indeed, Plaintiff does not argue in her Answer that Crown is not entitled to summary judgment under the Statute, but rather, that the Statute is unconstitutional under both the Pennsylvania and United States Constitutions.

---

[4] Crown has now paid substantially more than the $475 million it already had paid during the 2004 global briefing but, for purposes of this Motion, $475 million more than satisfies the Statute.

[5] The Pennsylvania Supreme Court reversed the Superior Court's holding that plaintiffs lacked standing to assert certain specific challenges to the constitutionality of the Statute.  The Supreme Court noted that "Plaintiffs . . . did not dispute that Crown Cork had already exceeded the statutory cap on liability."  8 A.3d at 324.

Plaintiff's arguments have been briefed and argued extensively in the Pennsylvania courts, and no Pennsylvania court has ever accepted them – nor should this Court. Accordingly, Crown is entitled to summary judgment under 15 Pa.C.S.A. § 1929.1.

### A. The Statute Is Not A "Special Law" And Does Not Violate Article III, § 32 Of The Pennsylvania Constitution

Plaintiff first argues that the Statute should be stricken as unconstitutional "special" legislation because it impermissibly creates a closed class of one – Crown – in violation of Article III, § 32 of the Pennsylvania Constitution.

Article III, § 32 provides that "[t]he General Assembly shall pass no local or special law in any case which has been or can be provided for by general law . . . ." Pa. Cons. art. III, § 32. The prohibition on special legislation does not "vitiate the Legislature's power to classify" nor does it "prohibit differential treatment of persons having different needs . . . provided the classifications at issue bear a reasonable relationship to a legitimate state purpose." Harrisburg School District v. Zogby, 828 A.2d 1079, 1088 (Pa. 2003). Accordingly, the law of Pennsylvania has been, for over one hundred years, that "[l]egislation for a class distinguished from a general subject is not special, but general; and classification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified . . . . If the distinctions are genuine, the courts cannot declare the classification void . . . ." Freezer Storage, Inc. v. Armstrong Cork Co., 382 A.2d 715, 718 (Pa. 1978) (quoting Dufour v. Maize, 56 A.2d 675, 677 (Pa. 1948), quoting Seabolt v. Commissioners of Northumberland Cty., 41 A. 22 (Pa. 1898)).

### 1. The Statute Is Not Limited To Crown

On its face, the Statute applies to all Pennsylvania corporations. Nonetheless, plaintiff argues that the Statute is *per se* unconstitutional under Article III, § 32 of the Pennsylvania

9

Constitution, because its classifications combine to set up a one-member, closed class, intended to benefit only Crown.[6]

Plaintiff has no evidence to suggest that Crown is, in fact, the only current member of the class – instead suggesting that it is Crown's burden to prove otherwise. (Memorandum of Law, p. 5). But even if Crown were the only current member of the class, the Pennsylvania Supreme Court has held that a one-member class is constitutional as long as it is possible for others to join the class. For example, in <u>Harristown Dev. Corp. v. Commonwealth Dep't of General Services</u>, the plaintiff challenged a statute ("Act 153") that applied the provisions of the Sunshine Act and the Right to Know Law to all nonprofit corporations that had leases with the Commonwealth worth in excess of $1,500,000. 614 A.2d 1128, 1130 (1992 Pa.). Plaintiff argued that Act 153 violated Article III, § 32 because the Harristown Development Corporation was the only nonprofit corporation in the Commonwealth that leased in excess of $1,500,000 worth of space to the government, and Act 153 was written specially for it. <u>Id.</u>, at 1131. The Supreme Court explicitly rejected this argument because "a classification of one member is *not* unconstitutional so long as other members might come into that class." <u>Id.</u>, at 1132 n.9 (emphasis added); <u>see also</u>, <u>Zogby</u>, 514 Pa. at 141, 828 A.2d at 1091 (explaining that even if statute created a class of only one member "so far," the class was "open for other members to come in"); <u>Wheeler v.</u>

---

[6] Plaintiff makes this argument from pages 4 to 9 of his Memorandum. Plaintiff makes another, repetitive, Article III, § 32 argument on pages 18 and 19 of the Memorandum. The "second" § 32 argument relies on <u>Harrisburg Sch. District v. Hickock</u>, which actually supports Crown and the constitutionality of the Statute. In <u>Harrisburg</u>, plaintiff challenged the Reed Amendment to the Education Empowerment Act, which exempted from the Act "a school district of the second class with a history of low test performance which is coterminous with the city of the third class which contains the permanent seat of government." 563 Pa. 391, 395-96, 761 A.2d 1132, 1135 (2000). Unlike the class presently before this Court, the class in the Reed Amendment was, by its terms, explicitly limited to one member. As the Court pointed out, the statute authorizing the location of the capital specifies that there be only one capital city, and, therefore, there could be no more than one member of the class. 563 Pa. at 398, 761 A.2d at 1136. Further, there was no rational basis for treating the Harrisburg School District differently from other school districts with failed educational systems. 563 Pa. at 397-98, 761 A.2d at 1136. Crown will address § 32 only once in this Reply.

Philadelphia, 77 Pa. 338 (1875) (classification of Philadelphia as a city of the first class was neither "local" nor "special" because others might join the class). Thus, plaintiff, as the party raising a *per se* challenge to the Statute bears the heavy burden of showing that (i) the "class consists of one member," and (ii) "is closed or substantially closed to future membership." Pa. Tpk. Comm'n v. Commonwealth, 587 Pa. 347, 369, 899 A.2d 1085, 1098 (Pa. 2006).

Pennsylvania Turnpike is not to the contrary. In Pennsylvania Turnpike, the challenged statute explicitly applied to a single public employer, the Turnpike Commission, and mandated collective bargaining for its first-level supervisors, as opposed to all other public employees. 899 A.2d at 1087, 1095. In striking the statute, the Supreme Court noted that the statute "created a class with one member and did so in a fashion that makes it impossible for another member to join the class." Id. at 1098. It emphasized that the class "will never open to more than one member" because the definition of "public employer" to whom the statute applied was "The Pennsylvania Turnpike Commission." Id. at 1098.

In contrast, the Statute does not create a closed class that could only ever include Crown. Indeed, the Statute's legislative history reflects that its sponsors intended Crown to be an example of the harm the Statute was intended to remedy, all the while emphasizing the potential benefit to other similarly situated corporations throughout the Commonwealth. For example, Senator Waugh discussed the fact that "1,200 companies have been drawn into asbestos litigation so far," and noted that a "study conducted by the Rand Corporation's Institute for Civil Justice" predicts new waves of asbestos litigation "against a whole new list of targets, including oil refining businesses, retailers, automobile manufacturers and distributors of automobiles, textile manufacturers, and other businesses." See, Pa. Legis. Journal – Senate (December 11, 2001) at

11

1232.  Senator Waugh specifically urged his colleagues to consider the impact of the Statute on this large pool of potential new targets when voting on the bill.  Id. at 1233.

Plaintiff here offers no evidence, of any kind, to demonstrate either that Crown is the only member of the protected class or that it is impossible or highly unlikely for another corporation ever to enjoy the Statute's protection.  The Philadelphia Court of Common Pleas, rejecting an identical Article III, § 32 challenge to the Statute, noted that there were 7,293 Pennsylvania corporations, and that the plaintiffs in that case had "fail[ed] to demonstrate any evidence" that other companies "do not now belong to the class or may someday enter the class." Crown Cork & Seal in re: Asbestos Litigation, 59 Pa. D. & C.4th 62, 91 (Phila. C.C.P. 2002), rev'd on other grounds, Ieropoli v. AC & S Corp., 842 A.2d 919 (Pa. 2004).  Plaintiff in this case has equally failed to demonstrate any evidence that other companies are not in the class.

Further, a corporation may limit its liability under the Statute only *after* the corporation has paid damages equal to its predecessor's value at the merger.  Plaintiff offers no evidence that a corporation which has not yet come forward could eventually meet the criteria for limiting liability.  Given the large and continually expanding universe of asbestos defendants, see Crown Cork & Seal, 59 Pa. D. & C.4th at 67 (discussing the growth in asbestos defendants and expectation that "many more will be brought into the litigation"), it remains mere speculation to suggest that the class is permanently closed to anyone but Crown.  Indeed, until asbestos plaintiffs have finished suing every Pennsylvania corporation with potential for asbestos-related damages, it will be impossible to know just how many companies ultimately will benefit from the Statute.

4870612

### 2. The Statutory Classifications Are Rationally Related To a Valid State Interest

The Memorandum does not dispute that Pennsylvania has a legitimate interest in regulating successor asbestos-related liabilities under its merger laws. Nor could it: the Commonwealth undisputedly has a "basic governmental interest to make sure our corporate merger laws do not unfairly expose innocent companies to ruin solely because of a merger." Pa. Legis. Journal – Senate (December 11, 2001), pp. 1231-32. Instead, it impermissibly second-guesses the reasonable lines drawn by the Legislature to achieve this goal.

For example, the Memorandum argues that the Legislature should not have limited the Statute to Pennsylvania corporations (Memorandum, p. 7); but that classification makes perfect sense because, as discussed above, the Statute is intended to remedy the problem of disproportionate successor asbestos-related liabilities arising from *mergers effected under Pennsylvania corporate law*. The Memorandum further quibbles with the General Assembly's decision to limit the Statute to companies incorporated and mergers occurring prior to May 1, 2001. (Memorandum, p. 7). Again, there is a rational basis for these distinctions; namely, preventing companies from opportunistically using the Statute on a prospective basis to wipe-out known asbestos liabilities by engaging in Pennsylvania-based mergers. Finally, the Memorandum questions the Legislature's decision to exclude insurance companies. (Memorandum, p. 8). But this distinction, too, is rational based on the obvious differences between an insurance company that voluntarily assumes risks for financial gain and a successor corporation that unwittingly assumed asbestos-related liability by corporate merger.

Because the Statute "rests on real distinctions" which are rationally related to a legitimate government interest, under well-settled law the Pennsylvania courts "have no further discretion to review the legislative judgment and must therefore uphold [the Statute] against the assertion

13

that it violates Pa. Cons. Art. III, s 32." <u>Freezer Storage</u>, 382 A.2d at 720; <u>see</u> <u>also</u> <u>Pennsylvania</u> <u>Liquor Control Board v. Spa Athletic Club</u>, 485 A.2d 732, 735 (Pa. 1984) ("Should the reviewing court detect . . . a [rational] basis, from whatever source, the legislation must be upheld").

### B. The Statute Does Not Violate The United States Constitution

Plaintiff next blurs the federal Equal Protection clause and the federal dormant Commerce Clause, arguing that the Statute treats similarly situated out-of-state corporations differently from in-state corporations, thereby creating a suspect class and interfering with interstate commerce. (Memorandum, pp. 10 – 15).

### 1. The Statute Does Not Violate Equal Protection

For reasons similar to those discussed above, the Statute does not deny Plaintiff – or anyone else – equal protection of the law.

Plaintiff does not identify any fundamental right that would entitle anyone to either intermediate or heightened scrutiny under the Equal Protection Clause. Plaintiff argues that "out-of-state corporations" are a "suspect class," but offers no authority under the Equal Protection Clause to support that supposition, instead relying on dormant Commerce Clause cases decided by the Pennsylvania Supreme Court, such as <u>Annenberg v. Commonwealth of</u> <u>Pennsylvania</u>, 757 A.2d 338 (Pa. 2000), <u>cert.</u> <u>denied</u>, 531 U.S. 959, 121 S.Ct. 385, 148 L.Ed.2d 296 (2000).

Because plaintiff cannot identify either a fundamental right or a suspect class afforded heightened scrutiny under the 14th Amendment, the Statute's constitutionality must be analyzed under the minimal "rational-basis" review. <u>Bd. of Trustees of the Univ. of Alabama v. Garrett</u>, 531 U.S. 356, 366, 121 S. Ct. 955, 963, 148 L. Ed. 2d 866 (2001). Under the rational-basis test,

a statute is constitutional unless the treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that the Court can only conclude that the statute is irrational. Kimel v. Florida Board of Regents, 528 U.S. 62, 84, 120 S. Ct. 631, 646, 145 L. Ed. 2d 522 (2000). The burden is on plaintiff to negate "any reasonably conceivable state of facts that could provide a rational basis for the classification." Univ. of Alabama, 531 U.S. at 367, 121 S. Ct. at 964.

As discussed above, the Statute is obviously rational: it prevents businesses from going into bankruptcy and causing permanent job loss in the local economy. It does so by fairly and equitably limiting the successor liability to the inflation-adjusted value of the assets of the company acquired in the merger that actually caused the liability, rather than allowing the unlimited and highly disproportionate recovery engendered solely by the happenstance of the merger. Because the Commonwealth has the power to create corporations, to allow them to merge, and to legislate the successor liability consequences of the merger, the Commonwealth is rationally permitted to set limits on that liability under its own corporate law. See, e.g., Posadas de Puerto Rico Associates v. Tourism Co. of P.R., 478 U.S. 328, 345-46, 106 S. Ct. 2968, 2979, 92 L. Ed. 2d 266 (1986) ("the greater power . . . necessarily includes the lesser power . . .).

The Statute also is directed at the accomplishment of legitimate interests: proportionality of liability and the preservation of businesses and jobs. It achieves these interests in a fair and equitable manner: by altering the remedies available to asbestos plaintiffs, so that a protected defendant's successor liability for asbestos-related injuries is no greater than the inflation-adjusted value of the assets of the company with which the defendant merged. This rational, laudable Statute in no way violates the Equal Protection clause of the Constitution. See Freezer

15

Storage, 382 A.2d at 718 (upholding statute of repose for builders, as opposed to landowners, on the basis that builders faced greater potential liability).

### 2. The Statute Does Not Interfere With Interstate Commerce

The Statute also does not violate the dormant Commerce Clause.

The dormant Commerce Clause prohibits states from "advanc[ing] their own commercial interests by curtailing the *movement of articles of commerce*, either into or out of the state." H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949) (emphasis added); Okla. Tax Com'n v. Jefferson Lines, Inc., 514 U.S. 175, 179-80, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (dormant Commerce Clause prohibits states from acting in a manner that burdens the flow of interstate commerce). Altering the remedies available for a certain tort does not in any way affect "commerce." City of Philadelphia v. New Jersey, 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978) (Commerce Clause protects "all objects of interstate trade"); Black's Law Dictionary 269 (6th ed. 1990) (commerce is "the exchange of goods, productions, or property of any kind; buying, selling, and exchanging of articles"); 15A Am.Jur.2d Commerce §42 (2000) ("generally speaking, anything that can be bought and sold is a subject of commerce"). A tort action is not an article of commerce; rather, it is the state-created right of a citizen to redress a wrong or a harm he has suffered. Moyer v. Phillips, 341 A.2d 441 (Pa. 1975). Because plaintiff has not suggested any manner by which §1929.1 affects interstate commerce, his dormant commerce clause challenge must fail. United Waste Systems of Iowa, Inc. v. Wilson, 189 F.3d 762, 765 (8th Cir. 1999) (in evaluating whether challenged regulation impermissibly infringes on interstate commerce, court must first determine whether "regulation even affects interstate commerce").

16

Plaintiff's argument that the Statute improperly discriminates against out-of-state competitors fails because the Statute does not interfere with the natural functioning of the interstate market through either prohibition or through burdensome regulation.  McBurney v. Young, 133 S.Ct. 1709, 1720, 185 L.Ed.2d 758 (2013).  A state's enactment of legislation that affects solely domestic corporations is not an instance of discrimination against either foreign corporations or interstate commerce.  CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 88, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67 (1987).  "As long as a State's corporation law governs only its own corporations and does not discriminate against out-of-state interests, it should survive this Court's scrutiny under the Commerce Clause, whether it promotes shareholder welfare or industrial stagnation."  CTS Corp., 481 U.S. at 95-96, 107 S.Ct. at 1653 (Scalia, concurring).

Annenberg v. Commonwealth, upon which Plaintiff primarily relies, is inapposite. There, the plaintiff challenged a statute that imposed a tax on stock ownership of foreign corporation that did not do business in Pennsylvania.  757 A.2d at 336 (2000).  For commerce clause purposes tax cases are analyzed differently from other cases.  Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 287, 97 S.Ct. 1076, 1083, 51 L.Ed.2d  326 (1977) (dormant Commerce Clause challenges to tax cases raise concerns not found in non-tax cases); Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 399 n.16 (3d Cir. 1987) (omitting "any discussion of the special values applicable to Commerce Clause challenges to state taxes").  Because § 1929.1 does not impose a *tax* on any transaction or incident, a question regarding its constitutionality cannot be analyzed in the same manner as are the statutes at issue in tax cases – like Annenberg.

Even if Annenberg were applicable, however, it is readily distinguishable.  Unlike the taxing statute in Annenberg, § 1929.1 is not facially discriminatory.  "The fact that the burden of

a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978). Rather, the challenged statute must *discriminate*. Taxing statutes discriminate if they "tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." Fulton Corp. v. Faulkner, 516 U.S. 325, 331, 116 S.Ct. 848, 854, 133 L.Ed.2d 796 (1996). The taxing statute challenged in Annenberg discriminated because the only stock on which an owner was liable to pay Pennsylvania tax was the stock of foreign corporations that did not do business in Pennsylvania. 757 A.2d at 336. In contrast, the Statute in the instant matter alters the remedies available against a certain class of Pennsylvania corporations, but is entirely and appropriately silent as to both the remainder of all Pennsylvania corporations and all out-of-state corporations.

Juzwin v. Asbestos Corp., Ltd. is equally inapplicable. In Juzwin, the defendant challenged the constitutionality of New Jersey's tolling law. 900 F.2d 686 (3d Cir.), cert. denied, 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 204 (1990). The law effectively denied foreign corporations the protection of New Jersey's statute of limitations. The law tolled the running of the statute for foreign corporations that were not represented in New Jersey, but allowed the statute to run with respect to New Jersey corporations and foreign corporations with registered agents in New Jersey. Id. at 688. The Third Circuit found the tolling statute to be facially discriminatory and unconstitutional because it "applie[d] to out-of-state corporations but not to New Jersey corporations . . ." and placed a "real burden" on them: "foreign corporations unrepresented but possibly amenable to long-arm service must make the difficult choice whether to file designations (with uncertain consequences) or forego a potential limitations defense, a

18

burden that neither New Jersey corporations nor foreign corporations registered to do business in New Jersey bear." Id. at 689, 691.

In contrast, § 1929.1 applies only to Pennsylvania corporations – those created by the Commonwealth of Pennsylvania. See Posadas, supra ("the greater power . . . necessarily includes the lesser power . . .). As is set forth above, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations . . ." CTS Corp., 481 U.S. at 89, 107 S.Ct. 1637. And, as importantly, the Statute places no burden whatsoever on the decision-making or future transactions of out-of-state corporations. Unlike the tolling statute in Juzwin, § 1929.1 is entirely silent as to out-of-state corporations. And, every other state remains free to enact similar legislation regarding any corporate successor liability that that state has created. Thus, Juzwin is entirely inapplicable to the instant matter.

Finally, in C & A Carbone, Inc. v. Town of Clarkstown, the town of Clarkstown entered into a consent decree with the New York State Department of Environmental Conservation that required it to build a new solid waste transfer station, and then planned to finance the station by having a private contractor construct the facility and operate it for five years. 511 U.S. 383, 386-87, 114 S.Ct. 1677, 1680, 128 L.Ed.2d 399 (1994). During the five years, the town guaranteed a minimum waste flow of 120,000 tons, which it ensured by requiring all non-hazardous solid waste within the town to be deposited at the station. Id. The Court found that requiring waste to be deposited in the station was "a financing measure" insufficient to justify the substantial restriction the ordinance placed on the free flow of commerce. Id. at 393, 114 S.Ct. at 1684. The Court held that "having elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State." Id. at 394, 114 S.Ct. at 1684.

19

Carbone is obviously different from the instant matter. Unlike the flow control ordinance in Carbone, the Statute has no impact on the free flow of any item of commerce. Further, the Statute does not constitute an election by the Commonwealth of Pennsylvania to use any "open market" to earn any "revenues." To the contrary, and as stated above, the Statute simply regulates domestic corporations. CTS Corp., 481 U.S. at 89, 107 S.Ct. 1637. Thus, Carbone bears no resemblance to the instant matter.

The Statute does not regulate any item in commerce. It regulates domestic corporations, and is entirely and appropriately silent as to foreign corporations. The cases cited by Plaintiff, whose analysis ignores these distinguishing features, are inapposite. Accordingly, the Statute does not violate the dormant Commerce Clause.

### C. Section 1929.1's Purpose, Subject, And Enactment Are Manifestly Proper

The Pennsylvania Supreme Court long-ago recognized that attacks on the enactment of a bill are frequently invoked as the final ploy of litigants with no hope of success. McSorley v. Fitzgerald, 59 A.2d 142, 146 (Pa. 1948) ("As is not unusual in attempts to establish that a statute is unconstitutional, the final assault is made on the title of the Act . . ."); Ewalt v. Pennsylvania Turnpike Com., 115 A.2d 729, 732-33 (Pa. 1955) (same). Nonetheless, the Memorandum argues that the manner in which the Legislature enacted the Statute violated the "single subject" and "original purpose" provisions of the Pennsylvania Constitution.

### 1. The Original Purpose Of The Legislation Did Not Change

Article III, § 1 of the Pennsylvania Constitution provides that "[n]o law shall be passed by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose." Pa. Const. art. III, § 1. In entertaining an original purpose

20

challenge, a court must consider (i) "the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose;" and (ii) "whether in its final form, the title and contents of the bill are deceptive." Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth, 877 A.2d 383, 408-09 (2005) ("PAGE").

The Pennsylvania Supreme Court has made clear that "the requirements of Section 3 must not become a license for the judiciary to exercise a pedantic tyranny over the efforts of the Legislature." PAGE, 877 A.2d at 395-96 (internal quotations omitted). It is well known that "bills are frequently subject to amendments as they proceed through the legislative process." Id., at 395. Accordingly, in undertaking this analysis, courts must "recognize the realities of the legislative process which can involve significant changes to legislation in the hope of consensus . . . and the expectation that legislation will be transformed during the enactment process." Id., at 409 (quotations omitted); see also, Consumer Party of Pennsylvania v. Commonwealth, 507 A.2d 323, 334 (1986) ("The practice of sending legislation to a conference committee is by its nature designed to reach a consensus. . . . It is therefore to be expected that the legislation that emerges from such a process may materially differ from the bills sent to the Committee for consideration. To unduly restrict this process would inhibit the democratic process. . . ."). Thus, the "original purpose must be viewed in reasonably broad terms" so as to allow the General Assembly a "full opportunity to amend and even expand a bill, and not run afoul of the constitutional prohibition on an alteration or amendment that changes its original purpose." PAGE, 877 A.2d at 409.

In trying to make it seem as if the Bill's original purpose was altered, the Memorandum argues that the original purpose of the Bill was solely to alter the statute of limitations for

asbestos claims.  As shown by <u>PAGE</u>, this construction of the Statute's original purpose is unduly narrow.  The original bill in <u>PAGE</u> dealt exclusively with background checks for the horse racing industry while the final bill created a comprehensive casino gaming framework. Despite the fact that the bill was "significantly amended and expanded, the Pennsylvania Supreme Court held that both the original and final purpose was "to regulate gaming."  <u>PAGE</u>, 877 A.2d at 409; <u>see</u> <u>also</u>, <u>Common Cause/Pennsylvania v. Commonwealth</u>, 710 A.2d 108, 120 (Pa. Commw. 1998) (rejecting claim that substantial amendments changed original purpose where purpose at bill's "inception and conclusion was to effect changes in the laws governing Pennsylvania's vehicular transportation system").  Here, as in <u>PAGE</u> and <u>Common Cause</u>, the Statute was enacted as part of legislation containing a single, unifying scheme, consistent with its original purpose: regulation of asbestos liability.

### 2.   The Statute Was Enacted As Part of A Bill Addressing a Single Subject: Regulation of Asbestos Liability

Article III, § 3 provides that "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title . . ."  Under Article III, § 3, a bill enacted by the General Assembly must meet two criteria: (i) the title of the bill must express the substance of the proposed law; and (ii) the differing topics within the bill must be "germane" to each other. <u>Com. v. Neiman</u>, 84 A.3d 603 (Pa. 2013).

Again, in "deference to the General Assembly's prerogative to amend legislation," "it is appropriate for a reviewing court to hypothesize a reasonably broad topic which would unify the various provisions of a final bill as enacted."  <u>Id.</u>, at 612.  In <u>PAGE</u>, the Pennsylvania Supreme Court rejected a "single subject" challenge to the Gaming Act.  877 A.2d at 394-96.  When the bill was first introduced, it dealt exclusively with the Pennsylvania State Police performing criminal history checks and verifying fingerprints of applicants for licensure in the horse racing

22

industry.  Id., at 391.  Thereafter, it was substantially amended to include, among other things, the creation of the Pennsylvania Gaming Control Board and the issuance of gambling licenses authorizing the creation of casinos.  Id., at 391-92.  The amendments increased the length of the bill from one page to over 145 pages.  Id., at 392.  Within just four days of the amendments, the bill was approved by the Senate and House and signed into law.  Id., at 392.  Rejecting an argument that the provisions of the act impermissibly regulated multiple subjects, the Pennsylvania Supreme Court held that there was "a single unifying subject—the regulation of gaming."  Id., at 396.

The Memorandum argues in conclusory fashion that there is nothing germane about the provisions limiting asbestos-related successor liabilities and amending the statute of limitations for asbestos claims, but the decision in PAGE clearly establish otherwise.  Just as the varied provisions addressing the subjects of "gaming" and the "vehicular transportation system" passed constitutional muster in those cases, so do the provisions here regulating asbestos liability.

Accordingly, the Statute's enactment fully satisfied Article III, §§ 1 and 3.

### D.      The Answer Itself Confirms The Propriety of Senator Stack's Legislative Actions

Plaintiff argues that the Court should strike down the Statute because Senator Stack voted on it, purportedly in violation of the Pennsylvania Constitution, Article III, §13, which requires any "member who has a personal or private interest in any measure of bill proposed or pending before the General Assembly" to "disclose the fact to the House of which he is a member, and shall not vote thereon."

Had plaintiff simply read the legislative history attached to its own Memorandum, it would have been obvious that this argument is nonsense.  Senator Stack not only disclosed that his law firm represented Crown, but also asked whether he ought to vote on the Statute.  Senator

Stack was directed by the Presiding Officer of the Senate that he was "required" to vote on the

Statute.

POINT OF ORDER

> The PRESIDING OFFICER. The Chair recognizes the gentlemen from Philadelphia, Senator Stack.
> Senator STACK. Madam President, I rise to ask the Chair for a ruling under Senate Rule XXI, section 2. As a partner in a law firm that represents Crown Cork & Seal, is it appropriate for me to vote on this bill, or should I recuse myself?
> The PRESIDING OFFICER. The Senator has requested a ruling from the Chair as to whether he is required to vote on the motion. He cites his membership in a law firm that is involved in the matter. The rules require that a Member not voting have a direct pecuniary interest in the outcome of the matter before this body. We find that as an attorney, Senator Stack is a member of a class and has, at best, if any interest, an indirect pecuniary interest, and it is the ruling of the Chair that you are required to vote on the motion.
> Senator STACK. Thank you, Madam President.

Legislative Journal – Senate, December 11, 2001, p. 1233.

In these circumstances, the propriety of Senator Stack's actions may not reasonably be

questioned. Manifestly, there was no violation of §13.

**E.     There Is No § 11 Argument**

Finally, the Memorandum quotes Articles [sic] I, § 11 of the Pennsylvania Constitution,

but does not provide any reason why the Statute might violate § 11. (Memorandum, p. 19).

Accordingly, Crown is entitled to summary judgment under 15 Pa.C.S.A. § 1929.1.

24

### III. <u>CONCLUSION</u>

For all of the foregoing reasons, as well as the reasons set forth in Crown's Motion for

Summary Judgment, Crown requests that this Court enter summary judgment in its favor.

Respectfully submitted,

/s

_____

THOMAS A. LEONARD
Of Counsel:                                     MATHIEU J. SHAPIRO
FELICE R. STACK                                 Obermayer Rebmann Maxwell & Hippel LLP
Law Offices of Michael J. Stack, Jr., P.C.      One Penn Center, 19th Floor
1247 Southampton Road                           1617 John F. Kennedy Blvd.
Philadelphia, PA  19116                         Philadelphia, PA  19103

                                                Attorneys for Defendant
                                                Crown Cork & Seal Company, Inc.

MJS:jrm

4870612

## CERTIFICATE OF SERVICE

I, MATHIEU J. SHAPIRO, hereby certify that Defendant, Crown Cork & Seal Company, Inc.'s Reply in Support of Motion for Summary Judgment of Defendant Crown Cork & Seal Company, Inc., were served electronically on November 5, 2014, to all parties.


_____
/S/
MATHIEU J. SHAPIRO

DATE:          November 5, 2014

4870612